### A01A1157. ROYLSTON et al. v. CONWAY.
(555 SE2d 28)

SMITH, Presiding Judge.

A special master was appointed to settle a boundary line dispute between two next-door neighbors.[1] The special master recommended a particular dividing line, and the trial court entered an order to that effect. Because we find that the trial court's order relied upon "evidence" not of record and that insufficient findings were made as to the issue of prescriptive title, we reverse.

This case is a dispute as to the exact location of an interior boundary line between Lot 6 and Lot 7 of Block B of the Legend Park subdivision. In April 1996, Grayson M. Roylston and Wynell Roylston purchased Lot 6 which had a one-story home with a basement on it. Almost immediately thereafter, Betty J. Conway, the next-door neighbor and owner of Lot 7, erected a chain-link fence that ran within two feet of the Roylstons' house down the length of their side yard. The placement of the fence impeded access to the Roylstons' backyard and effectively precluded their use of a one-car garage door dubbed a "boat door" located on the side of their house. The boat door provided the sole access for storing a vehicle or boat in the basement. It is undisputed that a brick wall running down the property line on the opposite side of the Roylstons' house blocks access to the back-yard from that side. Wynell Roylston testified that after Conway erected the fence, they could no longer use their backyard or the basement storage area and were unable to move their riding lawn-mower out or to remove their furniture stored in the basement. After installation of the fence, meter readers "had to come through our house and go down the steps to the back porch to read the meter." To mow the grass in their backyard, the Roylstons had to use a push mower which they carried through their house and down their back steps.

Conway's chain-link fence remained in place from May 1996 until October 14, 1996, when one of the Roylstons' sons dismantled it. After negotiations between the Roylstons and Conway floundered, Conway filed a petition to quiet title. The disputed property forms a pie-shaped piece of land that begins at a common front boundary

---

[1] Finding this case did not invoke its title to land jurisdiction, the Supreme Court transferred it to this court.

point on the right-of-way of Ridge Road and widens to form a wedge about 20 feet wide at its back point.

The trial court referred the matter to a special master. At the hearing before the special master, the Roylstons and Conway presented conflicting testimony and land surveys. A discrepancy of approximately 13 feet, perhaps attributable to an early surveying error in marking adjacent lot lines on the original subdivision plat, formed the crux of the controversy. The Roylstons also asserted that prescriptive title had been obtained by adverse possession by their predecessors in title. Chester Thomas Harden, a neighbor living directly across the street for 32 years, testified that Opal Erwin, his wife's sister, and her husband had built the house on Lot 6 in 1968. Harden, who had a role in the construction, testified that he was familiar with the side yard area between Lot 6 and Lot 7 and knew the location of the original back corner pin. Harden testified that the Erwins kept a car in the basement behind the boat door and had adequate room in their side yard to turn the car around. Harden recalled having occasionally driven his brother-in-law's car down there. He testified that the Erwins planted shrubbery in the currently disputed area and grew "regular grass" which they kept mowed.

In 1980, Opal Erwin sold the property to Nancy Ross Gresham, who sold it in 1990 to the Jacobsens, who subsequently sold it in 1996 to the Roylstons. When the Roylstons bought the property, they were unaware that since 1995 Conway and Jacobsen had been embroiled in a dispute over the interior boundary line. As a result of that disagreement, Conway had ordered a fence in April 1996 because as Conway testified, "I was fencing Mr. Jacobsen out." Bobby Conway testified that Mr. Erwin never commented when he cut trees in the disputed area and never disputed the title or any of the actions he took. Yet a warranty deed shows that the Erwins sold their interest in Lot 6 in 1980, years before the Conways purchased Lot 7.

After the hearing, the parties agreed to a consent order authorizing the special master to select an independent surveyor. The special master selected Herndon & Betterton, Inc. as the independent surveyor "to work with me in determining the correct dividing line between the properties." Subsequently, the special master found:

> After [hearing] the testimony of the parties, having personally inspected the property in the presence of Mr. Bobby Betterton of Herndon & Betterton, Inc., Surveyors, and after having further discussions with Mr. Betterton regarding the proper dividing line between the parties, I find the proper dividing line between the parties is that as shown on the plat of Herndon & Betterton which is more particularly described as follows. . . .

After citing a lengthy legal description, the special master stated, "It is my recommendation that the Court issue an Order making this line as the dividing line between the parties." The trial court adopted the findings of the special master and ordered the parties to abide by the dividing line set forth in the special master's report.

The Roylstons sought a new trial or, in the alternative, the entry of supplemental findings of fact and conclusions of law. They asserted that the original pin established a boundary line that included all of the area in dispute as belonging to Lot 6. They also claimed that the special master ignored uncontroverted evidence proving that they had obtained title by prescription. They pointed to evidence that their predecessors in title had planted and mowed grass, maintained landscaping, and used the area now in dispute for ingress and egress to the boat door.

The trial court directed the special master to file supplemental findings. The special master submitted a supplemental report in which he noted, "After hearing all testimony, I reported to the parties that I did not feel that the Plaintiff had carried the burden of proof to be entitled to have her Quia Timet action granted." According to the supplemental report:

> There was no testimony heard other than the original testimony given in the Quia Timet action. As Special Master, I hired the surveying firm of Herndon & Betterton, Inc. to prepare the independent survey and once completed, I visited the property in the presence of Mr. Bobby Betterton of Herndon & Betterton and inspected his findings and inspected the property. The boundary line between the parties, as determined by Mr. Betterton, was within an area between the parties' homes that was not in conflict with the testimony received at the Quia Timet hearing and was in an area that in my opinion was not adversely possessed by either party.

The trial court adopted the special master's supplemental findings of fact and conclusions of law and denied the motion for new trial. Enumerating four errors, the Roylstons appeal.

1. The Roylstons contend that the trial court erroneously considered matters outside the scope of the evidence introduced at trial in the form of conversations between the special master and the independent surveyor who was not a sworn witness and who was never subject to direct or cross-examination by the parties. They argue that no evidence of record supports the boundary as set and that the survey tried to account for a 13-foot error in the wrong place.

The purpose of findings of fact is threefold: as an aid in the trial

court's process of adjudication; for purposes of res judicata and estoppel by judgment; and as an aid in appellate review. *Gen. Teamsters Local Union No. 528 v. Allied Foods,* 228 Ga. 479, 480 (1) (186 SE2d 527) (1971). But "[a] bare statement of what the court considered in reaching its conclusions is not a recitation of how those facts give support to or what constitutes the separate conclusions." (Citation and punctuation omitted.) *Childs v. Sammons,* 271 Ga. 161, 162 (516 SE2d 779) (1999). In order to facilitate judicial review, the special master must make a complete record detailing the relevant facts entered in evidence. See generally *Meadows v. Barker,* 241 Ga. App. 753, 754 (1) (526 SE2d 643) (1999) (special master in quiet title action has the right to require the parties to file pertinent documents for which evidentiary foundation was already made at hearing). Moreover, he may not rely upon or recognize new facts or new evidence outside the proceedings.

But here, the special master apparently disregarded the evidence presented at the proceeding and relied entirely upon a newly created independent survey fashioned after the hearing. Although the parties consented to the order authorizing the special master to select an independent surveyor "to assist him in his duties," they did not agree to be bound by the resulting survey. The special master candidly admitted basing his factual findings as to the boundary line entirely on the independent survey, his conversations with Betterton, his meeting with Betterton, and his personal inspection of the property. Herndon & Betterton's billing statement reflects that this survey required extensive work, including 15.25 hours of field crew work, two hours by a registered land surveyor, another hour of research, plus ten hours of computer computations.

Inexplicably, the Betterton survey relies upon certain "computed points" at the southwest corners of Lot 6 and across the street, despite the fact that at least two other surveys in evidence used "IPF" (iron pin found) to denote the same corners of the subject property. The Betterton survey also does not appear to correspond with the legal description in the 1968 warranty deed for Lot 6. Other surveys in evidence, offered by the Roylstons and Conway, show entirely different boundary lines for the disputed area. The record contains no evidence about what a "computed point" is, how it was calculated, or why the use of a computed point was necessary. Nor was there any testimony about the relative value of a computed point vis-à-vis an iron pin.

When facts not properly in evidence are considered, the other party's rights cannot be protected fully since the privilege of cross-examination is denied. *Arnau v. Arnau,* 207 Ga. App. 696, 697 (1) (429 SE2d 116) (1993). Effective cross-examination is a substantial right, essential to the proper administration of justice, and extends

to all matters that are material to the controversy and are within the knowledge of the witness. *Frady v. State*, 212 Ga. 84, 85 (2) (90 SE2d 664) (1955). An expert witness may be impeached by disproving the facts to which he testified. OCGA § 24-9-82.

The special master relied upon post-hearing ex parte communications in order to make his findings. The independent survey constituted new "evidence" created sub silentio and was accepted without affording any opportunity to litigate the merits of the document. Reliance upon a document, unsworn statements, and ex parte conversations not in evidence was harmful error and highly prejudicial to the Roylstons. See *Osgood v. Dent*, 167 Ga. App. 406, 409-410 (2) (306 SE2d 698) (1983). Because the sole "evidence" of the true boundary is a document created by a witness not under oath and not subject to cross-examination, the Roylstons were deprived of all opportunity to engage in a thorough and sifting cross-examination of the witness. They were denied an opportunity to examine the methodologies employed so they could ascertain the basis for the calculation of the computed points and the surveyor's measurements. They were not afforded an opportunity to present evidence to contradict the independent survey or to determine whether it conflicted with recorded legal instruments. Although this survey may well be correct, it is not "evidence of record." Because a fundamental right was denied to the Roylstons, we must reverse the judgment of the trial court. *Arnau*, supra, 207 Ga. App. at 697.

2. The Roylstons contend that the location of the boundary is in direct conflict with uncontradicted evidence of their prescriptive title.

On this issue, the special master's comment that "[t]he boundary line between the parties, as determined by Mr. Betterton, . . . was in an area that in my opinion was not adversely possessed by either party," fails to provide any explanation as to how this conclusion was reached. See *Walker v. Hill*, 253 Ga. 126, 131 (2), (3) (317 SE2d 825) (1984) (failure to consider evidence of adverse possession warranted new trial). The special master's conclusory remark does not afford an adequate basis for determining what facts were considered or what law was applied. See *Allied Foods*, supra, 228 Ga. at 480.

Here, Conway acquired Lot 7 in September 1985 and began occupying a house on the property in October 1986. The Roylstons' evidence showed that from 1968 forward their predecessors in title had planted and mowed grass, maintained the landscaping, and used the area now in dispute for ingress and egress to the boat door and to access the backyard. The boat door, a one-car garage door, is original

to the house and has been in existence since 1968.[2] That the original owners, the Erwins, had exclusive possession of the area in controversy from 1968 until 1980 was not disputed, impeached, or otherwise contradicted by Conway. Wynell Roylston testified that the sprinkler system installed by Conway covered Conway's yard but provided "absolutely no water" to the area in controversy. Wynell Roylston testified that from "the way it was landscaped, you could tell" that the disputed area belonged to the owner of Lot 6. From her testimony it appears that the successors to the Erwins continued to maintain the grass and shrubbery in the area now claimed by Conway. Undisputed testimony showed that the only path for a lawnmower to reach the backyard was by passing through this area. In addition, David Lynah, a surveyor hired by Conway, testified that the normal, minimum setback would have required a house to be ten feet off the line, a legal requirement met only by the surveys presented by the Roylstons.

Numerous legal principles could have been applied to these facts. Generally, title by prescription is the right to property that a possessor acquires by the continuance of his possession for the period fixed by law. OCGA § 44-5-160. Prescriptive title requires proof that the possession did not originate in fraud and was public, continuous, exclusive, uninterrupted, peaceable, and accompanied by a claim of right. OCGA § 44-5-161; *Childs v. Sammons*, 272 Ga. 737, 739 (2) (534 SE2d 409) (2000). Possession by different holders may be tacked together when the prior possession also satisfies the other elements of adverse possession. *Fraser v. Dolvin*, 199 Ga. 638, 642 (34 SE2d 875) (1945). A claim of right will be presumed from the assertion of dominion, especially when the assertion of dominion is made by the erection of valuable improvements to the property. Id.; *Chancey v. Ga. Power Co.*, 238 Ga. 397, 398 (1) (233 SE2d 365) (1977). When an adverse possessor has held the property for the requisite period and prescriptive title ripens, all other inconsistent titles or claims are extinguished and the prescriptive title becomes the true title. *Fraser*, supra, 199 Ga. at 642. Alternatively, the Code provisions governing the determination of disputed boundaries could have application here. See, e.g., OCGA §§ 44-4-6; 44-4-7. But in the absence of any reference to the facts or the law, we cannot determine the legal principles relied upon in the special master's brief, conclusory, and unsupported finding.

On remand, should the evidence show that the Roylstons' predecessors in title obtained title by prescription, then resolution of the

---

[2] At the motion hearing, counsel for the Roylstons told the trial court that the portion of the disputed area given to his clients, measuring 6.2 feet at the back corner, left the boat door unusable and was "not in keeping with common sense."

discrepancies in the competing surveys would be unnecessary.[3] See *Ross v. Lowery*, 249 Ga. 307, 308 (2) (290 SE2d 61) (1982). Similarly, if prescriptive title ripened in 1988, then the subsequent disputes between Jacobsen and Conway or between the Roylstons and Conway would have no bearing on the issue of title.

3. In view of our holding in Division 1, the remaining issues are moot.

*Judgment reversed. Barnes and Phipps, JJ., concur.*

DECIDED SEPTEMBER 26, 2001.

*Sams & Larkin, Garvis L. Sams, Jr., Mitchell K. Greene*, for appellants.

*Edward A. Curtis, Jr.*, for appellee.

---

[3] Although direct and circumstantial evidence appears to prove that prescriptive title ripened in the owner of Lot 6 in 1988, this issue should be determined by the factfinder because the evidence relating to the period between 1980 to 1988 seems less than conclusive.